## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

FAYE RUBIN,

                    Plaintiff,

      vs.

ABBOTT LABORATORIES,

                    Defendant.

Case No. 13-CV-8667(CM)(RLE)

**ABBOTT LABORATORIES'
MEMORANDUM OF LAW IN SUPPORT
OF MOTION FOR SUMMARY
JUDGMENT**

---

Dated: April 2, 2015

Respectfully submitted,
ABBOTT LABORATORIES


By: _Meredith K_____

David E. Morrison (pro hac vice)
Meredith S. Kirshenbaum (pro hac vice)
GOLDBERG KOHN LTD.
55 E. Monroe
Suite 3300
Chicago, IL 60603
Tel: (312) 201-3972
Fax: (312) 873-7472
david.morrison@goldbergkohn.com
meredith.kirshenbaum@goldbergkohn.com

Gregory F. Hauser
Sherica Bryan
WUERSCH & GERING LLP
100 Wall Street, 10th Floor
New York, NY 10005
Tel: (212) 509-4717
Fax: (212) 509-9559
gregory.hauser@wg-law.com
sherica.bryan@wg-law.com

Attorneys for Defendant
Abbott Laboratories

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION...................................................................................................... 1

II.  UNDISPUTED FACTS ........................................................................................... 1

    A.   Rubin's Employment With Abbott. .............................................................. 1

    B.   Abbott's MPS Program. ............................................................................... 2

    C.   Rubin's Performance as an MPS.................................................................. 3

    D.   Rubin's resignation and allegations of discrimination.................................. 5

III. ARGUMENT ........................................................................................................... 6

    A.   Rubin's Federal Discrimination, Retaliation and Harassment Claims are
        Time-Barred............................................................................................... 6

    B.   Rubin's Constructive Discharge Claims Fail As a Matter of Law.................... 7

    C.   Rubin's Remaining State and Local Claims Fail As a Matter of Law............. 11

        1.   Rubin Cannot Establish a State or City Discrimination Claim............ 11

            i.   Rubin has no direct evidence of discrimination ....................... 11

            ii.  Rubin cannot state a prima facie case under state or city
                law ........................................................................................ 12

                (a)   Rubin   did   not   suffer   any   state   law   adverse
                        employment actions ...................................................... 12

                (b)   Rubin cannot show differential treatment under city
                        law ............................................................................... 15

                (c)   Rubin   cannot   show   Abbott   acted   with   a
                        discriminatory motive .................................................. 16

            iii. Rubin cannot show that Abbott's legitimate, non-
                discriminatory reasons are pretext for discrimination ............. 17

        2.   Rubin Cannot Prove Her Hostile Work Environment Claim............... 19

        3.   Rubin Cannot Establish a State or City Retaliation Claim ................. 23

IV.  CONCLUSION ........................................................................................................ 24

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Alfano v. Costello*,
    294 F.3d 365 (2d Cir. 2002) ....................................................................... 20

*Bailey v. Synthes*,
    295 F. Supp. 2d 344 (S.D.N.Y. 2003) ................................................. 17, 18

*Bir v. Pfizer, Inc.*,
    510 F. App'x 29 (2d Cir. 2013) ................................................................. 21

*Breland-Starling v. Disney Pub. Worldwide*,
    166 F. Supp. 2d 826 (S.D.N.Y. 2001) ...................................................... 15

*Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*,
    990 F.2d 1397 (2d Cir. 1993) ...................................................................... 7

*Carlucci v. Kalsched*,
    78 F. Supp. 2d 246 (S.D.N.Y. 2000) ........................................................ 10

*Chavez v. Iberia Foods Corp.*,
    05CV2464 (NG)(RER), 2007 WL 1959028 (E.D.N.Y. 2007) .................... 8

*Crawford v. Dep't of Investigation*,
    324 F. App'x 139 (2d Cir. 2009) .............................................................. 11

*Davis-Bell v. Columbia Univ.*,
    851 F. Supp. 2d 650 (S.D.N.Y. 2012) ................................................ passim

*Delgado v. Triborough Bridge & Tunnel Auth.*,
    485 F. Supp. 2d 453 (S.D.N.Y. 2007) ...................................................... 14

*E.E.O.C. v. Bloomberg L.P.*,
    29 F. Supp. 3d 334 (S.D.N.Y. Apr. 28, 2014) ........................................... 8

*E.E.O.C. v. Bloomberg L.P.*,
    778 F. Supp. 2d 458 (S.D.N.Y. 2011) ........................................................ 9

*Epstein v. City of New York*,
    No. 06 CIV. 3788(TPG), 2009 WL 2431489 (S.D.N.Y. Aug. 6, 2009) ............... 9, 17

*Ferrand v. Credit Lyonnais*,
    No. 02 CIV.5191(VM), 2003 WL 22251313 (S.D.N.Y. Sept. 30, 2003) *aff'd*,
    110 F. App'x 160 (2d Cir. 2004) .............................................................. 18

*Flaherty v. Metromail Corp.*,
    59 F. App'x 352 (2d Cir. 2002) .................................................................. 10

*Forrest v. Jewish Guild for the Blind*,
    3 N.Y.3d 295 (2004) ................................................................................... 22

*Frankel v. City of New York*,
    No. 06 CIV. 5450 LTS/DFE, 2009 WL 465645 (S.D.N.Y. Feb. 25, 2009) ............. 13

*Gaffney v. Dep't of Info. Tech. & Telecommunications*,
    536 F. Supp. 2d 445 (S.D.N.Y. 2008) ........................................................... 11

*Galabya v. New York City Bd. of Educ.*,
    202 F.3d 636 (2d Cir. 2000) ................................................................. 12, 13

*Garone v. United Parcel Serv., Inc.*,
    436 F. Supp. 2d 448 (E.D.N.Y. 2006) *aff'd sub nom. Sardina v. United Parcel*
    *Serv., Inc.*, 254 F. App'x 108 (2d Cir. 2007) ............................................... 21

*Gross v. Nat'l Broad. Co.*,
    232 F. Supp. 2d 58 (S.D.N.Y. 2002) ............................................................... 6

*Harris v. Forklift Systems, Inc.*,
    510 U.S.17 (1993) ...................................................................................... 19

*Hongyan Lu v. Chase Inv. Servs. Corp.*,
    412 F. App'x 413 (2d Cir. 2011) ................................................................. 18

*Jeune v. City of New York*,
    No. 11 CIV. 7424 JMF, 2014 WL 83851 (S.D.N.Y. Jan. 9, 2014) ......... 12, 15, 21, 23

*Kamrowski v. Morrison Mgmt. Specialist*,
    No. 05-CV-9234 KMK, 2010 WL 3932354 (S.D.N.Y. Sept. 29, 2010) ................... 17

*Lawless v. TWC Media Solutions, Inc.*,
    487 F. App'x 613 (2d Cir. 2012) ................................................................. 18

*Lioi v. New York City Dep't of Health & Mental Hygiene*,
    914 F. Supp. 2d 567 (S.D.N.Y. 2012) ........................................................... 16

*Marks v. Nat'l Comm. Ass'n, Inc.*,
    72 F. Supp. 2d 322 (S.D.N.Y. 1999) ........................................................ 8, 10

*Mayers v. Emigrant Bancorp, Inc.*,
    796 F. Supp. 2d 434 (S.D.N.Y. 2011) ........................................................... 24

*McDowell v. T-Mobile USA, Inc.*,
    307 F. App'x 531 (2d Cir. 2009) ................................................................. 23

*Nakis v. Potter,*
 422 F. Supp. 2d 398 (S.D.N.Y. 2006) ...................................................................... 9, 10

*Nat'l R.R. Passenger Corp. v. Morgan,*
 536 U.S. 101 (2002) ....................................................................................................... 7

*Payne v. Malemathew,*
 No. 09-CV-1634 CS, 2011 WL 3043920 (S.D.N.Y. July 22, 2011) ......................... 20

*Rosario v. Hilton Hotels Corp.,*
 476 F. App'x 900 (2d Cir. 2012) .............................................................................. 16

*Rutkowski v. Sears Roebuck Corp.,*
 210 F.3d 355 (2d Cir. 2000) ..................................................................................... 10

*Sardina v. United Parcel Serv., Inc.,*
 254 F. App'x 108 (2d Cir. 2007) ....................................................................... 21, 22

*Savarese v. William Penn Life Ins. Co. of N.Y.,*
 418 F. Supp.2d 158 (E.D.N.Y. 2006) ....................................................................... 14

*Sparrock v. NYP Holdings, Inc.,*
 No. 06 CIV. 1776 (SHS), 2008 WL 744733 (S.D.N.Y. Mar. 4, 2008) ................ 9, 10

*Stetson v. NYNEX Serv. Co.,*
 995 F.2d 355 (2d Cir. 1993) ................................................................................. 7, 8, 9

*Stoddard v. Eastman Kodak Co.,*
 309 F. App'x 475 (2d Cir. 2009) ........................................................... 13, 14, 16, 19

*Terry v. Ashcroft,*
 336 F.3d 128 (2d Cir.2003) ..................................................................................... 10

*Weeks v. New York State (Div. of Parole), abrogated on other grounds,*
 273 F.3d 76 (2d Cir. 2001) ....................................................................................... 13

*Weinstock v. Columbia Univ.,*
 224 F.3d 33 (2d Cir. 2000) ....................................................................................... 12

*Weston v. Optima Commc'ns Sys., Inc.,*
 No. 09 CIV. 3732 (DC), 2009 WL 3200653 (S.D.N.Y. Oct. 7, 2009) ............... 22, 23

*Wimes v. Health,*
 157 F. App'x 327 (2d Cir. 2005) .............................................................................. 23

*Young v. Rogers & Wells LLP.,*
 No. 00 CIV. 8019(GEL), 2002 WL 31496205 (S.D.N.Y. Nov. 6, 2002) ............ 13, 14

**<u>Statutes</u>**

42 U.S.C. § 2000e-5(e)(1) ......................................................................................... 6

## I.     INTRODUCTION

Faye Rubin is a former Abbott Molecular sales representative that left Abbott for another high-paying pharmaceutical sales position after the birth of her first child so she could spend more time at home with her husband and baby.  Despite leaving for a better work-life balance, Rubin claims she was forced to leave Abbott because of gender or pregnancy discrimination. Rubin also claims she was retaliated against and subjected to a hostile work environment while at Abbott.   Rubin's various federal claims are time-barred because the record evidence establishes that all events occurred prior to April 12, 2012, 300 days prior to when she filed her EEOC charge of discrimination.

Rubin's state and local law claims of gender discrimination, hostile work environment and retaliation also fail as a matter of law.  Rubin's deposition testimony undercuts her claims. Rubin cannot establish that she suffered any adverse actions, that she was subjected to any differential treatment or that she engaged in any protected activity.  Rubin also has not shown any evidence of pretext or that Abbott intentionally created an abusive work environment for Rubin because of her gender.  Abbott's motion for summary judgment should therefore be granted.

## II.     UNDISPUTED FACTS

### A.     Rubin's Employment With Abbott.

Abbott is a global, broad-based health care company.   Rubin began her at-will employment with Abbott on October 11, 1999 as a sales representative but resigned on March 19, 2000.  (SOF ¶ 2).  Rubin was re-hired by Abbott's Molecular Division on January 7, 2008, as a Molecular Physician Specialist sales representative ("MPS").  (SOF ¶ 3).  On June 17, 2008, Rubin began reporting to Michael Kohler, MPS Sales Manager.   (SOF ¶ 4).  Kohler reported to Christopher Jowett, GM U.S. & Canada Commercial Ops.  (SOF ¶ 4).

**B.     Abbott's MPS Program.**

MPS' were responsible for sales to physicians.  (SOF ¶ 5).  In her role as an MPS, Rubin initially focused on selling a product to physicians called "UroVysion," a urine-based molecular test used to diagnose and monitor bladder cancer. (SOF ¶ 6).  The MPS counterpart, Molecular Account Executive sales representatives ("MAE"), were responsible for selling the "UroVysion" product to hospital laboratories, clinic laboratories, and reference laboratories, where physicians without their own laboratories could send tests for processing.  (SOF ¶ 7).

MPS' were eligible for incentive bonuses based on their annual sales.  (SOF ¶ 8).  MPS' annual sales goals were based on the individual MPS' sales from the prior year.  (SOF ¶ 8).  Any actual sale made to a physician within the MPS' sales territory counted towards the individual MPS' sales goals.  (SOF ¶ 9).  In the first two years of Rubin's employment as an Abbott MPS, this was true even for sales to physicians without their own laboratories who used UroVysion through an outside laboratory.  (SOF ¶ 10).  In 2010, however, Abbott Molecular's management decided to shift the MPS sales strategy to selling the UroVysion product directly to laboratories ("direct sales").  (SOF ¶ 11).  Accordingly, all MPS' responsibilities were expanded to include direct sales to urologists, meaning sales to urologists conducting UroVysion testing in their own laboratories on their premises.  This included sales to urologists who already had their own laboratories and sales to urologists who installed laboratories as a result of the MPS' sales efforts. (SOF ¶ 11).  As a result, in 2010, the MPS bonus calculation changed so that the MPS sales goal no longer included sales to urologists who used outside laboratories, but was based only on MPS' direct sales.  (SOF ¶ 12).

Effective January 1, 2011, Medicare substantially decreased reimbursement for the UroVysion product.  (SOF ¶ 13).  Market demand for UroVysion decreased significantly causing

Abbott to reallocate resources away from selling UroVysion. (SOF ¶ 13). In fact, in 2011, Abbott reduced the nationwide MPS headcount from 15 to eight. Many male MPS' lost their job even as Rubin maintained her position. (SOF ¶ 14). In late 2010 and early 2011, several remaining MPS' territories, including the territories of Rubin and her male colleague Frank Dalli, expanded to cover the vacant geographies. (SOF ¶ 15). Another MPS' territory expanded to cover all of Texas and Oklahoma.[1] (SOF ¶ 16). In 2012, the MPS headcount continued to decrease and several of the remaining MPS' territories, including Rubin's, were again expanded. (SOF ¶ 17). All of the decisions related to territory modifications were made primarily by Jowett and Steven Cielocha, Senior Analyst, Strategic Planning, with Kohler's input. (SOF ¶ 18). By the end of 2012, the MPS nationwide headcount decreased to four and in 2013, the entire MPS program was disbanded. (SOF ¶ 19).

### C.    Rubin's Performance as an MPS.

In 2008, when Rubin initially began reporting to Kohler, her sales territory consisted of the Manhattan area of New York City, which was the smallest MPS territory nationwide. (SOF ¶ 20). Nonetheless, Rubin's territory was arguably the best territory in the country for an MPS based on density and number of doctors. (SOF ¶ 20). Rubin performed well in 2008 and 2009, and Kohler rated her as "Achieving Expectations" ("AE") on her annual reviews. (SOF ¶ 21).

In 2010, due to the shift in MPS sales strategy to direct sales, Rubin's territory became more challenging. (SOF ¶ 22). Because of Manhattan's high cost of real estate, the physicians in Rubin's territory were reluctant and/or unable to set up UroVysion laboratories. (SOF ¶ 22). Accordingly, Rubin's sales performance was poor in 2010: she ranked 17 out of 17 for sales and achieved only 19% of her sales goal. (SOF ¶ 23). Rubin's only laboratory sale in 2010 was in

---

[1] As discussed below, that same MPS, Denise Brown, had twins in 2011. Brown found Kohler to be supportive of her pregnancy and her career. (SOF ¶ 16)

Maryland, a vacant territory which she was assigned to cover temporarily for a period of time in 2010.[2]  Noting that Rubin had "[n]o new UV Lab closes in 2010 in her Manhattan territory" and that "[s]he did not sell the required capital instrumentation in 2010", Rubin's 2010 review rated her only "Partially Achieving Expectations" ("PA").  (SOF ¶¶ 24-25).

In early 2011, Rubin complained that her territory was not profitable.  (SOF ¶ 29).  In response to Rubin's concerns, and the reduced headcount nationwide, Rubin's sales territory expanded to include areas where physicians may be more likely to set up laboratories – the Bronx, Connecticut, Rhode Island, and some parts of New York state.  (SOF ¶ 29).  Even after the 2011 territory expansions, Rubin's territory was the smallest of all MPS' territories.  (SOF ¶ 29).  Nonetheless, during the first two quarters of 2011, Rubin's sales remained poor.  Rubin's overall sales goal was much lower than most other MPS representatives, yet she only reached 42% of her goal as of the second quarter.  (SOF ¶ 31).

Rubin's managers attempted to help Rubin succeed in her new territory and in a marketplace that was not very favorable to UroVysion sales.  As part of the 2011 territory expansion, Rubin acquired two accounts, Hudson Valley and Histopathology, that had placed big orders early in 2011 (and in years before) but stopped ordering before Rubin acquired those accounts.  (SOF ¶ 32).  Kohler worked with Jowett and Cielocha to ensure that her bonus would not be impacted by those lost accounts, and they were removed from her 2011 goals.  (SOF ¶ 32).  Rubin concedes that problems related to her bonus calculation were resolved.  (SOF ¶ 33).  By July 2011, though, Kohler had observed that Rubin did not seem to understand (and did not

---

[2] In February 2010, Rubin became responsible for selling a product related to HIV testing to laboratories in Manhattan.  During this time, Rubin did not call on urologists.  (SOF ¶ 26).  By March 8, 2010, Kohler notified Rubin that Jowett had decided Rubin should return her focus to UroVysion sales.  (SOF ¶ 27).  Rubin was never notified that her performance or compensation would be measured differently during this short time period. (SOF ¶ 27). In any event, the male MPS who was responsible for UroVysion sales in Manhattan during early 2010, like Rubin, did not achieve any laboratory sales. (SOF ¶ 28). Had he, Rubin would have received credit for those sales when she resumed her responsibility for the territory. (SOF ¶ 28).

utilize) the sales model, and was again not on pace to meet her 2011 sales goals.  (SOF ¶ 34).

Thus, after seeking advice from Abbott's Employee Relations ("ER") department, Kohler

delivered a performance memorandum to Rubin on July 12, 2011.  (SOF ¶ 35).  To help Kohler

monitor her performance, Rubin was required to submit weekly call planners to him.  (SOF ¶

35).  The day before, Kohler issued a substantially similar memo to a male underperforming

MPS, Phillip Crawford, and also required Crawford to submit weekly call planners.  (SOF ¶ 36).

Kohler continued to coach and counsel Rubin in the fall of 2011.  In weekly call planners

from October 22, 2011 to December 31, 2011, Rubin noted only two trips outside of Manhattan,

to locations less than one hour away.  Kohler did not discipline Rubin for failing to visit

territories outside of Manhattan but encouraged her to do so, and to explore opportunities in the

rest of her territory.  (SOF ¶ 37).  Further, in January 2012, after reviewing Rubin's most recent

sales numbers, Kohler recommended that Rubin be removed from her coaching plan and

communicated to Abbott's ER department that Rubin would be receiving an AE rating for her

2011 review.  (SOF ¶ 38).  Prior to receiving her 2011 review, in March 2012, Rubin began a

medical leave of absence related to her pregnancy.  (SOF ¶ 39).  While on leave, on March 30,

2012, Kohler informed Rubin that her territory was expanding to include parts of Massachusetts.

(SOF ¶ 40).  Around the same time, all MPS' territories were restructured as well.  (SOF ¶ 40).

Even after the expansion, Rubin's territory remained one of the smallest.  (SOF ¶ 40).  Rubin

concedes that she would have been capable of covering the expanded territory after returning

from her leave of absence. (SOF ¶ 41).

### D.    Rubin's resignation and allegations of discrimination.

Rubin went on medical leave related to her pregnancy on March 6, 2012.  (SOF ¶ 42).

While she was on leave, Rubin e-mailed with Kohler on March 29 and 30, 2012 about her

territory.  (SOF ¶ 43).  Rubin did not have any interactions with Kohler after these emails.  (SOF

¶ 43).  Kohler did not make any statements to Rubin related to her gender or her pregnancy while she was on leave.  (SOF ¶ 43).  Further, prior to going on leave, Rubin never told Kohler that business travel could impact her ability to work after her pregnancy.  (SOF ¶ 44).  It was Kohler's intention and hope that Rubin would return to work following her leave.  (SOF ¶ 45).

Soon before her leave ended, on August 27, 2012, Rubin advised ER that she was resigning for "professional and personal" reasons.  (SOF ¶ 46).  Prior to resigning, Rubin had interviewed and accepted a sales position at Genoptix, where her total compensation was potentially greater than at Abbott.  (SOF ¶ 47).  Even though Genoptix would still require her to travel, Rubin accepted the position at least in part because after she had her baby, she "needed to be home for some [] time and working at Genoptix provided [her] that ability." (SOF ¶ 47).  Rubin's testimony made clear why she wanted to spend more time at home:  "I had to be home. I have a husband;" "When you have a baby there is a lot of attention that needs to be given to a baby from their mother;" and "I wanted to be home with my child."  (SOF ¶ 47).

Rubin was familiar with how to complain to ER, and had done so on several occasions.  (SOF ¶ 49).  Prior to her resignation, Rubin never complained to ER about discrimination.[3]  (SOF ¶ 50).

## III.    ARGUMENT

### A.    Rubin's Federal Discrimination, Retaliation and Harassment Claims are Time-Barred.

Rubin's Title VII gender[4] discrimination, retaliation and hostile work environment claims are time-barred.  "In New York, Title VII claims must be filed with the Equal Employment Opportunity Commission ("EEOC") within 300 days of the alleged discriminatory act."  *Gross v. Nat'l Broad. Co.,* 232 F. Supp. 2d 58, 69 (S.D.N.Y. 2002); *see also* 42 U.S.C. § 2000e-5(e)(1).

---

[3] Rubin also did not complain to Abbott's Business Human Resources department. (SOF  ¶ 50).
[4] Any federal pregnancy discrimination claim also would be time-barred. *See* Dkt. No. 11 at p. 8.

"When a plaintiff fails to file a timely charge with the EEOC, the claim is time-barred." *Butts v. City of N.Y. Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1401 (2d Cir. 1993), superseded by statute on other grounds; *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 118 (2002) (in order for hostile work environment to be timely, employee must file a charge within 300 days of an act that is part of the hostile work environment claim). This Court considered, and granted Abbott's motion to dismiss, in part, on these exact grounds. (Dkt. No. 11). The Court held that "alleged discrete acts of gender discrimination [and retaliation] that took place prior to the only alleged event to have occurred within 300 days of the filing of her charge – April 12, 2012, are indeed time barred." *Id*. at 8-9. The Court *only* permitted Rubin's federal discrimination and hostile work environment claims to proceed to the extent "that the last claim of territorial realignment – the one relating to the realignment that took place during [Rubin's] medical leave – took place within 300 days of the filing of her charge." *Id*. at 6. Discovery in this case has revealed definitively, however, that the territory realignment occurred prior to March 30, 2012, thus outside of the 300-day window. (SOF ¶¶ 14-15). Rubin also cannot identify any statements Kohler made related to her gender or her pregnancy after she went on leave, or *any* interactions with Kohler after the March 30, 2012 email. (SOF ¶ 43). The Court should grant summary judgment on Rubin's federal discrimination, retaliation and hostile work environment claims.

## B.   Rubin's Constructive Discharge Claims Fail As a Matter of Law.

Rubin's complaint vaguely alleges she was constructively discharged for some discriminatory reason. Such a claim fails as a matter of law and cannot survive Abbott's motion for summary judgment. Claims for constructive discharge under Title VII, New York Executive Law ("NYSHRL") and New York City Administrative Code ("NYCHRL") are "governed by the same standards." *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360 (2d Cir. 1993); *see also*

*E.E.O.C. v. Bloomberg L.P.*, 29 F. Supp. 3d 334, 338 (S.D.N.Y. Apr. 28, 2014).  Rubin fails to identify the actual discriminatory basis for her alleged constructive discharge; the crux of her allegation is really that it would have been virtually impossible to cover her expanding territory given her desire to spend time with her husband and new baby.  That claim fails as a matter of law under federal, state and local law.

Constructive discharge results where an employee is "forced to resign due to intolerable working conditions."  *Marks v. Nat'l Comm. Ass'n, Inc.*, 72 F. Supp. 2d 322, 338 (S.D.N.Y. 1999).  "A work atmosphere is 'intolerable' if conditions are so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Id*. at 340.  The evidence in this case belies Rubin's constructive discharge claim.  Fatal to her claim, Rubin conceded during her deposition that she was capable of covering the expanded territory assignment.  (SOF ¶ 41).  Instead, though, Rubin resigned to accept the Genoptix position so she could spend more time at home with her husband and baby.  Rubin testified: "I needed to be home for some of that time and working at Genoptix provided me that ability;" "I had to be home. I have a husband;" "When you have a baby there is a lot of attention that needs to be given to a baby from their mother;" and "From my prerogative [sic] I wanted to be home with my child."  (SOF ¶ 47).  However, "[a] plaintiff generally cannot establish a constructive discharge claim merely by offering evidence that [s]he was dissatisfied with [her] work assignments, that [s]he felt [her] work was unfairly criticized, or that [her] work conditions were difficult or unpleasant."  *Chavez v. Iberia Foods Corp.*, 05CV2464 (NG)(RER), 2007 WL 1959028, at *8 (E.D.N.Y. 2007) (intolerable situation not established despite employee's complaint of increased geographic territory); *see also Stetson*, 995 F.2d at 360 ("Nor is the standard for constructive discharge merely whether the employee's working conditions were difficult or unpleasant.").

Rubin's testimony makes very clear that, at most, the territory expansion occurring while Rubin was on leave resulted in a difficult or unpleasant work condition, because she desired to spend more time with her husband and family.  It is Rubin's prerogative to choose to pursue a new career opportunity that would afford her more time at home with her family.  But a desire for a greater work-life balance cannot form the basis for a constructive discharge claim.  *See, e.g.*, *Epstein v. City of New York*, No. 06 CIV. 3788(TPG), 2009 WL 2431489, at *6 (S.D.N.Y. Aug. 6, 2009) (plaintiff could not establish constructive discharge where his own testimony indicated that he wished to care for his ailing mother); *Sparrock v. NYP Holdings, Inc.*, No. 06 CIV. 1776 (SHS), 2008 WL 744733, at *15 (S.D.N.Y. Mar. 4, 2008) (no constructive discharge where plaintiff resigned after already accepting a better position at another firm); *see also E.E.O.C. v. Bloomberg L.P.*, 778 F. Supp. 2d 458, 485 (S.D.N.Y. 2011) ("The law does not mandate 'work-life balance.'").  Rubin resigned for personal reasons, not the result of any discriminatory actions.

Rubin's constructive discharge claim further fails given the experience of other MPS' working under similar if not more challenging conditions.  "[T]he test for constructive discharge is an objective one."  *Nakis v. Potter*, 422 F. Supp. 2d 398, 415-16 (S.D.N.Y. 2006).  Accordingly, "a claim of constructive discharge must be dismissed as a matter of law unless . . . a reasonable person in the employee's shoes would have felt compelled to resign."  *Stetson*, 995 F.2d at 361.  Rubin concedes that another MPS, Denise Brown, had twins in 2011 and continued to work under Kohler – all while covering all of Texas and Oklahoma, a territory obviously much larger than Rubin's.  (SOF ¶ 16).  Working with Kohler in an expanded territory did not force Brown to quit her job.  (SOF ¶ 16).  Given that Brown remained employed as an MPS, when Rubin did not, Rubin cannot establish that her working conditions were so difficult that a reasonable person in her shoes (including a new mother dealing with the same supervisor) would

have felt compelled to resign.  *See Carlucci v. Kalsched*, 78 F. Supp. 2d 246, 257 (S.D.N.Y. 2000) (where other employees operated under similar conditions yet none besides plaintiff felt compelled to resign, plaintiff's constructive discharge claim failed as a matter of law).

To the extent that any claim for constructive discharge alleges that Kohler created a discriminatory working environment that Rubin could not tolerate, that argument likewise fails. Kohler's alleged conduct occurred long before Rubin's termination and thus does not support a belated claim of constructive discharge.  *See, e.g.*, *Flaherty v. Metromail Corp.*, 59 F. App'x 352, 355 (2d Cir. 2002) (recognizing that constructive discharge claim must be linked to current working conditions); *Rutkowski v. Sears Roebuck Corp.*, 210 F.3d 355 (2d Cir. 2000) (same); *see also Sparrock v. NYP Holdings, Inc.*, No. 06 CIV. 1776 (SHS), 2008 WL 744733, at *15 (S.D.N.Y. Mar. 4, 2008) (no constructive discharge where last event occurred prior to going on medical leave).  Given the lapse in time between her interactions with Kohler and her resignation, Rubin cannot establish that her constructive discharge "occurred in circumstances giving rise to an inference of discrimination on the basis of her membership in a protected class." *Nakis*, 422 F. Supp. 2d at 413 (citing *Terry v. Ashcroft,* 336 F.3d 128, 151–52 (2d Cir.2003)) (internal punctuation omitted).  It couldn't have: for nearly five months prior to her resignation, Rubin had no interactions with Kohler, let alone any interactions giving rise to an inference of gender discrimination.  In any event, Rubin's "personality conflict" with Kohler, and her perception of his treatment as "harsh or intolerant" are insufficient to state a claim for discriminatory constructive discharge.  *See Marks*, 72 F. Supp. 2d at 340 (personality conflict with supervisors cannot form basis of constructive discharge claim); *see also Davis-Bell v. Columbia Univ.*, 851 F. Supp. 2d 650, 678 (S.D.N.Y. 2012).  The Court should grant summary judgment on Rubin's constructive discharge claims.

C.      **Rubin's Remaining State and Local Claims Fail As a Matter of Law.**

1.      **Rubin Cannot Establish a State or City Discrimination Claim**

Rubin also alleges that she was discriminated against based on her gender or pregnancy in violation of the NYSHRL and the NYCHRL.  In order to prevail on her state and city claims, Rubin must offer either direct or indirect evidence of gender or pregnancy discrimination.  *See Davis-Bell*, 851 F. Supp. 2d at 669.

i.      **Rubin has no direct evidence of discrimination**

Rubin does not have any direct evidence of gender or pregnancy discrimination.  Rubin vaguely alleges that at some undisclosed point in time, Kohler commented that Rubin was "acting girlie" and that "girls are emotional."  These alleged comments do not meet the burden of proving direct evidence of gender or pregnancy discrimination.  "Comments can supply direct evidence of discrimination, but not without evidence connecting the remarks to the employment action at issue." *Crawford v. Dep't of Investigation*, 324 F. App'x 139, 142 (2d Cir. 2009) (internal citations omitted); *see also Gaffney v. Dep't of Info. Tech. & Telecommunications*, 536 F. Supp. 2d 445, 459 (S.D.N.Y. 2008) (noting that while a comment "could reasonably be interpreted as using gender to belittle [plaintiff] it is well settled that stray remarks, with no nexus to the alleged adverse employment action, do not, without more, establish gender discrimination.") (internal citations omitted).  Rubin's allegations related to Kohler's comments are not tied to any point in time and are completely unrelated to any of the alleged adverse actions of which she complains.  Furthermore, for each of the alleged adverse employment actions, Kohler operated under the guidance of Abbott's ER department or upper-level management, further attenuating any connection between Kohler's alleged comments and the allegedly adverse employment actions.

ii.       **Rubin cannot state a *prima facie* case under state or city law**

Because there is no direct evidence of gender or pregnancy discrimination, in order to establish a *prima facie* case of discrimination under the NYSHRL, Rubin must show that: "(1) she is a member of a protected class; (2) she is qualified for her position; (3) she suffered an adverse employment action; and (4) the circumstances give rise to an inference of discrimination."  *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000).  "The NYCHRL modifies the third prong of the prima facie case so that the adverse action need not be 'material.'"  *Jeune v. City of New York*, No. 11 CIV. 7424 JMF, 2014 WL 83851, at *4 (S.D.N.Y. Jan. 9, 2014).  Instead, Rubin must show "differential treatment that is more than trivial, insubstantial, or petty" and "must still adduce evidence supporting an inference of discrimination."  *Id.* (internal citation omitted).  Rubin cannot meet her burden under the NYSHRL or NYCHRL. Rubin alleges that Abbott discriminated against her by:  (i) issuing her negative performance evaluations, (ii) subjecting her to unwarranted performance management, (iii) failing to take a change in responsibilities into account for her 2010 bonus calculation, (iv) by increasing the size of her territory in 2011 and 2012, and (v) by constructively discharging her (which claim is addressed, *supra*, in Section III.B).  Rubin cannot show that these incidents were adverse employment actions under state law, that they constitute *differential* treatment under city law or that they were related to her gender.

(a)       **Rubin did not suffer any state law adverse employment actions**

Under New York state law, "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment."  *Galabya v. New York City Bd. of Educ.*, 202 F.3d 636, 640 (2d Cir. 2000).  "To be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a

termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (internal citations and punctuation omitted).

Here, none of the alleged actions constitute "adverse employment actions" because there is no evidence that Rubin was terminated, demoted, had her salary reduced, assumed a less distinguished title or suffered a material loss of benefits. Second Circuit case law is clear that negative performance evaluations, "excessively harsh criticism" and performance counseling, even where unjustified, do not constitute adverse employment actions. *Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 478-79 (2d Cir. 2009); *Weeks v. New York State (Div. of Parole)*, *abrogated on other grounds*, 273 F.3d 76, 86 (2d Cir. 2001) ("It hardly needs saying that a criticism of an employee (which is part of training and necessary to allow employees to develop, improve and avoid discipline) is not an adverse employment action."); *Frankel v. City of New York*, No. 06 CIV. 5450 LTS/DFE, 2009 WL 465645, at *3 (S.D.N.Y. Feb. 25, 2009) ("negative performance evaluations do not constitute adverse employment actions"). This analysis is not affected by the fact that in connection with her performance counseling, Rubin was required to submit weekly call planners, which was not a "materially adverse change" to her employment. *See Young v. Rogers & Wells LLP.*, No. 00 CIV. 8019(GEL), 2002 WL 31496205, at *5 (S.D.N.Y. Nov. 6, 2002) (being required to do more work is not an adverse employment action).

Similarly, Rubin's 2011 and 2012 territorial expansions were alterations of job responsibilities and not adverse employment actions. *Frankel* ("Neither a 'mere reassignment,' nor a 'lateral transfer,' nor a change in job responsibilities, nor employment actions that merely reduce a plaintiff's job satisfaction, constitute an adverse employment action."); *see also Savarese v. William Penn Life Ins. Co. of N.Y.*, 418 F. Supp.2d 158, 161-62 (E.D.N.Y. 2006)

(territorial reassignment with somewhat altered responsibilities is not an adverse employment action).  This is particularly true given that the territorial realignment decisions were primarily made by upper-level management pursuant to structural changes which affected other employees besides Rubin. Under similar circumstances, the Second Circuit has held that even eliminating an employee's position and offering her a new job instead is not an adverse employment action.  *See Stoddard v. Eastman Kodak Co.*, 309 F. App'x 475, 479 (2d Cir. 2009); *see also Delgado v. Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 461 (S.D.N.Y. 2007) (alterations of job responsibilities, where not heavily disproportionate to those similarly situated, does not constitute an adverse employment action).  Furthermore, Rubin's territory was increased to give her *more* opportunities to be successful, since as Rubin noted, laboratory sales were difficult in her existing territory.  This is decidedly not an adverse employment action.  *See, e.g., Young*, 2002 WL 31496205, at *6 ("Giving an employee more work, which could even be perceived as giving an employee a chance to excel, is not an adverse employment action.") (internal citation omitted).  Rubin's preference to spend more time at home with her family than her colleagues could spend with their families cannot form the basis of an adverse action claim.

Rubin also alleges that Abbott erred in calculating her 2010 annual bonus because her goal did not account for when she did not call on urologists for a "very short time."  (SOF ¶ 26).  Rubin has not offered any evidence in support of her assertion that her bonus was calculated incorrectly.  In any event, during the remainder of 2010, given the territory's challenges, Rubin did not have *any* laboratory sales.  And during the very short time period where Rubin did not call on urologists in her territory, a male MPS did, and like Rubin, he also did not have any sales.  Had the other MPS been successful, Rubin would have been credited with those sales when she resumed her responsibility for the territory, so there was no harm associated with her brief

absence from the territory. (SOF ¶ 28).  In light of these facts, to the extent that Rubin's bonus was calculated incorrectly (which Abbott denies), it likely had no impact on her total compensation for 2010, and is not a materially adverse employment action.  *See Breland-Starling v. Disney Pub. Worldwide*, 166 F. Supp. 2d 826, 835 (S.D.N.Y. 2001) (failure to give employee bonus not materially adverse change in terms and conditions of her employment).

### (b)    Rubin cannot show differential treatment under city law

To succeed on her claim under the NYCHRL, Rubin must demonstrate "differential treatment that is more than trivial, insubstantial, or petty."  *Jeune*, 2014 WL 83851, at *6 (internal citation omitted).  Rubin cannot show that she was subjected to any differential treatment.  To the contrary, Rubin's male colleagues received nearly identical treatment.  For example, Phil Crawford, a male MPS, was subject to virtually identical performance counseling as Rubin, including the requirement to submit weekly call planners to Kohler.  (SOF ¶ 36).  Rubin's colleagues, both male and female, also were affected by each of the territory realignments that Rubin alleges were discriminatory (and male MPS' lost their jobs while Rubin expanded her territory).  (SOF ¶ 14).  And, even after the territory expansions, Rubin continued to have one of the smallest geographic territory of any MPS.  (SOF ¶ 20).  For the brief time in 2010 that she was not covering her territory, a male MPS covered it and thus was treated just as she.  Further, Rubin complains of Kohler's allegedly harsh treatment, but concedes that Kohler was curt and aggressive in group settings to other employees, including her male colleagues. (SOF ¶ 54).  In reality, Rubin was seeking preferential treatment over her MPS colleagues because she had a husband and child.  Under the record facts, Rubin cannot establish the third prong of her *prima facie* case of discrimination, even under NYCHRL's more permissive standard.

### (c)        Rubin cannot show Abbott acted with a discriminatory motive

Finally, no evidence exists to support the claim that Rubin was discriminated against based on her gender or pregnancy, which Rubin must show to state a claim for discrimination under state or city law.  While a plaintiff "may raise an inference of discrimination by showing that she was subjected to disparate treatment," for the reasons discussed above, Rubin cannot show that any similarly situated male employees were treated more favorably than she.  Rather, Rubin's male colleagues were consistently treated the same, and at times *worse*, than Rubin.  For instance, Rubin survived a RIF when some of her male colleagues did not, and even after her territory expansions she had one of the smallest territories to cover in the country.  (SOF ¶¶ 14, 20).  Rubin thus cannot establish disparate treatment based on her gender.  *See, e.g.*, *Rosario v. Hilton Hotels Corp.*, 476 F. App'x 900, 902 (2d Cir. 2012) (internal citation omitted) (plaintiff did not state *prima facie* case of gender discrimination where defendant submitted record evidence demonstrating that male and female employees received equal treatment); *Stoddard*, 309 F. App'x at 479 (2d Cir. 2009) (granting summary judgment for employer where plaintiff failed to establish male employees were actually treated any differently than she was).

The only evidence Rubin has offered to support a discriminatory motive based on gender or pregnancy discrimination are her bald assertions that Kohler was sexist, given his alleged statements that  Rubin was "acting girlie" or that "girls are emotional."  For the reasons discussed above, these alleged statements are stray remarks and do not support that Kohler intentionally discriminated against Rubin based on her gender.  *See Lioi v. New York City Dep't of Health & Mental Hygiene*, 914 F. Supp. 2d 567, 586 (S.D.N.Y. 2012) (statements that were "clearly gender-related," such as "This is an old boy's school" and "This is a man's world. Stop rocking the boat" did not support an inference of discriminatory motive where they were not close in time to plaintiff's suspension).  Rubin also argues that her perception of Kohler as harsh,

intolerant, and curt, and his use of aggressive tones and statements such as "duh duh duh," "are you stupid," or "you are going to have a bad day," support her claims of gender discrimination. (SOF ¶ 52). The vast majority of the statements and conduct that Rubin finds discriminatory are strictly gender-neutral. In fact, Rubin admits that some of Kohler's comments could have had a totally innocent construction to them. (SOF ¶ 53). Such remarks, even if perceived as rude, are wholly unrelated to gender and therefore cannot support an inference of gender discrimination. *See, e.g., Kamrowski v. Morrison Mgmt. Specialist*, No. 05-CV-9234 KMK, 2010 WL 3932354, at *13 (S.D.N.Y. Sept. 29, 2010) (derogatory comments to female employees, "though certainly rude," were gender neutral statements that did not indicate gender animus or support an inference of discrimination).

### iii.   Rubin cannot show that Abbott's legitimate, non-discriminatory reasons are pretext for discrimination

Even if Rubin could satisfy her burden of establishing a *prima facie* case of gender or pregnancy discrimination under state or city law, Abbott can offer legitimate, non-discriminatory reasons for each of the alleged adverse employment actions given Rubin's poor performance and the structural changes effecting the entire MPS sales division. *See, e.g.*, *Epstein*, 2009 WL 2431489, at *6 (S.D.N.Y. Aug. 6, 2009) ("evidence of his unsatisfactory job performance would suffice to show that any adverse actions taken against [plaintiff] were done for legitimate, nondiscriminatory reasons"); *Bailey v. Synthes*, 295 F. Supp. 2d 344, 356 (S.D.N.Y. 2003) (employer provided evidence of legitimate, non-discriminatory reason for reduction in employee's sales territory where general business strategy was to reduce and reassign territories in order to boost sales); *Ferrand v. Credit Lyonnais*, No. 02 CIV.5191(VM), 2003 WL 22251313, at *6 (S.D.N.Y. Sept. 30, 2003) *aff'd*, 110 F. App'x 160 (2d Cir. 2004) (employer offered legitimate, non-discriminatory business reasons justifying plaintiff's decreased bonus,

including that the employer was entitled to set its own policy in determining bonus allocations). Rubin has not, and cannot, show that Abbott's legitimate reasons are pretext for gender or pregnancy discrimination.

In order to establish pretext, Rubin "must produce not simply some evidence, but sufficient evidence to support a rational finding that the ... reasons proffered by [Abbott] were false, and that more likely than not discrimination was the real reason for the employment action." *Lawless v. TWC Media Solutions, Inc.*, 487 F. App'x 613, 616 (2d Cir. 2012) (internal citation omitted).  The only evidence Rubin points to of pretext is her perception that Kohler was sexist and "intolerant of women," based on "the things he said and [] by his treatment of [Rubin]," including Kohler's alleged statements "duh duh duh," "are you stupid," "you are going to have a bad day," "you are acting girlie," and "you are emotional." (SOF ¶ 52).  Because the alleged remarks are either gender-neutral or not temporally related to any of the alleged adverse actions, they do not suffice to establish pretext.  *Lawless*, 487 F. App'x at 616.  What remains, Rubin's conclusory allegation that Kohler was sexist or intolerant of women, is decidedly insufficient to establish pretext.  *See, e.g.*, *Hongyan Lu v. Chase Inv. Servs. Corp.*, 412 F. App'x 413, 417 (2d Cir. 2011) (self-serving and conclusory allegations of pretext cannot defeat summary judgment).

Throughout Rubin's employment at Abbott, given changing market dynamics, the MPS position underwent consistent and substantial restructuring, which ultimately resulted in dissolution of the MPS sales force.  The alleged adverse employment actions relate largely to those changes, which are entirely independent of Rubin's gender.  In order to prevail on her claims of discrimination, Rubin has to prove that Abbott's nationwide restructuring (which affected every MPS), was done in an effort to force her to resign because of her gender.  This is

-18-

unsubstantiated and nonsensical, especially because it was Abbott's intention and hope that Rubin would return to work following her maternity leave. (SOF ¶ 45). *See Stoddard,* 309 F. App'x at 479 ("[Plaintiff] has also not given any remotely plausible reason why Kodak would engage in a restructuring of an entire division simply to eliminate her position, and then offer her a new one."). Rubin has offered no evidence that Abbott's stated reasons for its actions are false. Rubin's state and city claims for gender and pregnancy discrimination fail as a matter of law.

### 2.    Rubin Cannot Prove Her Hostile Work Environment Claim

Rubin's state and city claims for hostile work environment also cannot survive summary judgment. To defeat Abbott's motion for summary judgment on her NYSHRL hostile work environment claim, Rubin "must introduce evidence showing that her 'workplace was permeated with discriminatory intimidation, ridicule, and insult,' which was 'sufficiently *severe or pervasive* to alter the conditions of the victim's employment and create an abusive work environment.'" *Davis-Bell*, 851 F. Supp. 2d at 672, *citing Harris v. Forklift Systems, Inc.,* 510 U.S.17, 21 (1993) (punctuation omitted). Relevant factors in making this assessment include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* Under the NYCHRL, Rubin does not have to prove "severe or pervasive" harassment, but still must show that she "has been treated less well than other employees because of her gender." *Id*. at 671. The NYSHRL and the NYCHRL, however, are not "'general civility code[s]' and 'petty slights and trivial inconveniences' are not actionable" under either. *Id*. Rubin cannot show severe or pervasive harassment or any differential treatment on the basis of her gender.

Rubin alleges she was subjected to a hostile work environment because over the course of a number of years, she experienced the alleged adverse actions and harsh treatment discussed

above.   *See* pp. 12, 16-17, *supra*.   These alleged incidents are insufficient to establish discrimination and an objectively hostile work environment.   Most of the alleged incidents relate directly to personnel decisions that, for the reasons discussed previously, were not adverse to Rubin, applied equally or more so to her colleagues, and lack any linkage or correlation to gender discrimination; these cannot form the basis of a hostile work environment claim.   *See, e.g., Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002) ("It is [] important in hostile work environment cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise, the federal courts will become a court of personnel appeals."); *Payne v. Malemathew*, No. 09-CV-1634 CS, 2011 WL 3043920, at *3 (S.D.N.Y. July 22, 2011) (work-related criticisms and corrective actions cannot support a claim for hostile work environment).

The only conduct that remains to be considered are Rubin's allegations that Kohler was harsh, intolerant and curt, and made comments consistent therewith.   However, isolated incidents, including "teasing, casual comments or  sporadic conversation will not be deemed to create a hostile work environment." *Davis-Bell,* 851 F. Supp 2d at 670 (internal citations omitted).   In *Davis-Bell*, this Court considered whether the plaintiff could establish a claim for hostile work environment where she alleged nine different series of episodic incidents over four years, including: being cursed and yelled at, being imprisoned, having paper thrown at her, having her complaints ignored, false accusations of policy violations and fraud, repeated requests for plaintiff's transfer and reassignment by her supervisor, being overlooked for a promotion, having her promotion not reflected on the company website and verbal abuse and humiliation over two years.   This Court held that such conduct, consisting of many "minor and sporadic" incidents, was not continuous enough to be considered pervasive.   851 F. Supp. 2d at 672-74. *See*

*also Garone v. United Parcel Serv., Inc.*, 436 F. Supp. 2d 448, 469 (E.D.N.Y. 2006) *aff'd sub nom. Sardina v. United Parcel Serv., Inc.*, 254 F. App'x 108 (2d Cir. 2007) (supervisors off-colored comments including references to "office bitch," "Brooklyn bimbettes," and "cat fights" could not establish claim for hostile work environment; "Comments such as these, while bearing a connotation of sexuality, can only be questionably characterized as 'mere offensive utterances.'").   The conduct alleged in *Davis-Bell* was far more frequent and much more egregious than the conduct Rubin alleges, which amounts to mere teasing and inconveniences and cannot establish a claim for hostile work environment under state or local law.

Moreover, under both NYSHRL and NYCHRL Rubin "can only succeed on her claim if she can prove that her mistreatment at work . . . occurred *because of* a protected characteristic." *Davis-Bell*, 851 F. Supp. 2d at 671 (internal citation and punctuation omitted); *see also Jeune*, 11 CIV. 7424 JMF, 2014 WL 83851 (S.D.N.Y. Jan. 9, 2014) ("An environment that ... arises from personal animosity[ ] is not actionable under the civil rights statutes.") (internal citations and quotations omitted).   For the reasons discussed above, Rubin cannot establish that Kohler's alleged mistreatment occurred *because* she was a woman.   Rubin received the same treatment as her male colleagues: Rubin herself admits that Kohler was curt and aggressive to all MPS'.  (SOF ¶ 52).  *See, e.g., Bir v. Pfizer, Inc.*, 510 F. App'x 29, 32-33 (2d Cir. 2013) (where the bulk of the evidence supported the conclusion that manager treated the employees he disliked poorly, whether male or female, there was insufficient basis for reasonable jury to conclude that his mistreatment of plaintiff was based on gender).   Rubin's conclusory allegations that Kohler was less harsh towards men or that Kohler called her "girlie" are unsubstantiated and do not affect this analysis.  *See Davis-Bell*, 851 F. Supp. 2d at 677-78 (plaintiff's conclusory assertions that white employees were treated more favorably were insufficient to establish discriminatory

animus); *see also Sardina v. United Parcel Serv., Inc.*, 254 F. App'x 108, 110 (2d Cir. 2007) (a few off-color comments related to gender did not rise to an objectively hostile work environment). Accordingly, Rubin's NYSHRL and NYCHRL hostile work environment claims fail as a matter of law.

Finally, Rubin's NYSHRL hostile work environment claim further fails because she cannot show any basis, let alone a specific basis, for imputing any of the alleged objectionable conduct to Abbott. *Weston v. Optima Commc'ns Sys., Inc.*, No. 09 CIV. 3732 (DC), 2009 WL 3200653, at *3 (S.D.N.Y. Oct. 7, 2009) ("plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer"). To succeed on her NYSHRL claim, Rubin must show that Abbott "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.*; *see also Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 311 (2004) (state hostile work environment claim failed where plaintiff failed to offer any evidence that plaintiff ever reported allegations of racial epithets or harassment to anyone at employer). There is no dispute that at all relevant times, Abbott had in place a Workplace Harassment Policy, yet Rubin never availed herself of that policy. (SOF ¶ 55). Prior to her resignation, Rubin never complained to Abbott's ER Department that Kohler discriminated against her based on her gender or that he otherwise treated her unfairly. (SOF ¶ 50). Accordingly, Rubin cannot prove that Abbott was aware of the alleged harassment and did nothing about it, as required in order to state a NYSHRL claim for hostile work environment. *See Weston*, 2009 WL 3200653, at *3.

For each of these reasons, Abbott is entitled to summary judgment on Rubin's claims for hostile work environment.

### 3.      Rubin Cannot Establish a State or City Retaliation Claim

Under the NYSHRL, in order to establish a *prima facie* case of retaliation, a plaintiff must show: "(1) [s]he engaged in a protected activity; (2) [her] employer was aware of this activity; (3) the employer subjected [her] to a materially adverse employment action; and (4) a causal connection exists between the adverse action and the protected activity." *Jeune*, 2014 WL 83851, at *6. "The elements of a retaliation claim under the NYCHRL are identical, except that the plaintiff need not prove any 'adverse' employment action; instead, [s]he must prove that something happened that would be reasonably likely to deter a person from engaging in protected activity." *Id.* (internal citations and quotations omitted). Rubin cannot establish a *prima facie* case of retaliation under either the NYSHRL or the NYCHRL because she never engaged in any protected activity.

"A protected activity refers to action taken to protest or oppose statutorily prohibited discrimination." *Wimes v. Health*, 157 F. App'x 327, 328 (2d Cir. 2005) (internal citations and punctuation omitted). Moreover, pursuant to the requirement that the employer be aware of the protected activity, the employer must have understood, or could reasonably have understood, that any complaint was specifically directed at conduct prohibited by employment discrimination laws. *Id.*; *McDowell v. T-Mobile USA, Inc.*, 307 F. App'x 531, 534 (2d Cir. 2009) (affirming summary judgment for employer where plaintiff "never explicitly complained about racial discrimination").

Rubin's Complaint asserts that she "lodge[ed] a complaint with Human Resources regarding the Company's gender discrimination." (Dkt. No. 1, ¶¶ 89, 96, 100). On this basis, this Court held that to the extent it was timely, Rubin's retaliation claim could survive Abbott's motion to dismiss. (Dkt. No. 11, pp. 8-9). Rubin's own deposition testimony confirms, however, that prior to her resignation, Rubin never complained to anyone in Abbott's ER department that

she believed Kohler to be discriminating against her based on her gender, or any other protected characteristic. (SOF ¶ 50). This is true, despite the fact that Rubin was familiar with the process for raising concerns with Abbott's ER department, and on several other occasions, had in fact taken advantage of that process to inquire about other issues related to her employment. (SOF ¶ 49). Tellingly, Rubin's own contemporaneous notes related to her allegations also do not make any reference to Rubin's belief that she was being treated differently based on her gender. (SOF ¶ 51). *See Mayers v. Emigrant Bancorp, Inc.*, 796 F. Supp. 2d 434, 448 (S.D.N.Y. 2011) (letter listing complaints did not reference gender). Because Rubin did not engage in any protected activity, her retaliation claims will not survive summary judgment.

For all the reasons articulated above, Rubin also did not experience any adverse employment actions. Even if she had, however, pursuant to the analysis above, Abbott had legitimate, non-retaliatory reasons for all of its actions and, in any event, Rubin cannot prove that those actions were pretext for retaliation.

## IV.    CONCLUSION

For all of these reasons, the Court should grant Abbott's Motion for Summary Judgment.

Dated: April 2, 2015                          GOLDBERG KOHN LTD.
       New York, New York

                                              By: _Meredith K_____

                                              David E. Morrison (pro hac vice)
                                              Meredith S. Kirshenbaum (pro hac vice)
                                              Goldberg Kohn Ltd.
                                              55 East Monroe St., Suite 3300
                                              Chicago, IL 60603
                                              Tel: (312) 201-3972
                                              Fax: (312) 873-7472
                                              david.morrison@goldbergkohn.com


                                              Gregory F. Hauser
                                              Sherica Bryan
                                              100 Wall Street, 10th Floor
                                              New York, NY 10005
                                              Tel: (212) 509-4717
                                              Fax: (212) 50-9559
                                              gregory.hauser@wg-law.com

                                              Attorneys for Defendant
                                              Abbott Laboratories




To:    Ellen Margaret Nichols
       EMN Law , P.C.
       1661 First Avenue, Suite 35
       New York, NY 10028
       Tel: (646) 206-5004
       Fax: (646) 543-3150 (fax)
       ellen.m.nichols@gmail.com

       Attorney for Plaintiff
       Faye Rubin